**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 3:22-cr-35 |
| ) | |
| KORTNEY THOMAS KELLEY, ) | |
| ) | |
| *Defendant*. ) | |

**UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR AN
UPWARD VARIANCE**

While many Americans reeled from financial hardship and suffering during the COVID-19 pandemic, the defendant, Kortney Thomas Kelley, exploited the unique national moment to perpetrate a greater than $1.1 million fraud involving multiple pandemic relief programs. ECF No. 48 (Statement of Facts, or "SOF") ¶¶ 16 ($1,143,224 Paycheck Protection Program fraud), 21 (unemployment insurance fraud), 22 ($10,000 Economic Injury disaster Loan fraud). While many applicants to these governmental programs were unable to receive needed funding as COVID-19 relief funding ran out, Kelley was squandering his ill-gotten gains at casinos around the country. *Id.* ¶ 18. Then, after being released on bond by this Court, Kelley abused the Court's trust by failing to appear in Court on multiple occasions – all while lying to the Court to explain his non-appearance. *See, e.g.,* ECF No. 50 (Pre-Sentence Report, or "PSR") ¶ 7. It is only after he was arrested in connection with a separate check fraud scheme – which he is alleged to have perpetrated in Vestavia Hills, Alabama while on bond in this matter– that Kelley was found and returned to this Court for further proceedings. PSR ¶ 10.

As explained below, application of the § 3553(a) factors—in particular, the seriousness of Kelley's offenses, the need to deter Kelley and similar defendants, and the need to provide just

1

punishment—support an upward variance from the properly calculated Guidelines Range of 51-63 months to 78 months' imprisonment.

**I.  Background and Pre-Sentence Report Guidelines Range Calculation**

On April 5, 2022, the government filed a five-count Indictment charging Kelley with: (1) Wire Fraud, in violation of 18 U.S.C. § 1343 (Counts 1-3); and (2) Engaging in Monetary Transactions in Criminally Derived Property, in violation of 18 U.S.C. §§ 1957 (Counts 4-5).  ECF No. 1.

On May 31, 2022, the government moved this Court to appoint an independent psychiatric examiner to perform a competency examination of the defendant, Kortney Thomas Kelley, after the defense previewed concerns about the defendant's competency.  ECF No. 19.  On June 2, 2022, the Court vacated trial deadlines, set a competency hearing for the defendant on September 6, 2022, and appointed psychiatric examiner Dr. Evan Nelson to perform a competency examination of the defendant.  ECF No. 22.  Dr. Nelson completed his psychiatric examination of the defendant on July 18, 2022, finding the defendant competent.  After the defendant failed to appear for Court proceedings on multiple occasions (as detailed further below), the Court revoked the defendant's bond and issued a warrant for the defendant's arrest.  ECF Nos. 32, 33.  The arrest warrant return was executed on September 22, 2022.  ECF No. 35.

Thereafter on January 11, 2023, the defendant pled guilty to Count 3 (Wire Fraud) of the Indictment, carrying a maximum penalty of 20 years' imprisonment and 3 years' supervised release.  ECF Nos. 46-48.  The PSR calculates Kelley's applicable Guidelines Range as 51-63 months' imprisonment, based on a Criminal History Category of I and a Total Offense Level of 24.  PSR ¶ 79.  The United States has no objections or corrections to the PSR. The PSR properly applies the following enhancements and reductions, none of which are contested:

- Base offense level of 7, pursuant to § 2B1.1(a)(1). PSR ¶ 25.

- 14 level enhancement for loss amount greater than $550,000 but less than $1,550,000, pursuant to § 2B1.1(b)(1)(H). PSR ¶ 26.
- 2 offense level enhancement for an offense involving conduct described in 18 U.S.C. § 1040, pursuant to U.S.S.G. § 2B1.1(b)(12): Specifically, Kelley's fraud offense involved the theft of Federal Emergency Management Agency-funded lost wage assistance ("LWA") benefits, which were disbursed and paid in connection with the with a major disaster declaration for COVID-19 pursuant to Section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act. PSR ¶¶ 15-17, 27.
- 2 offense level enhancement because the defendant derived more than $1,000,000 in gross receipts from a financial institution, pursuant to U.S.S.G. § 2B1.1(b)(12). PSR ¶ 28.
- 2 offense level enhancement for obstruction because the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice by not appearing for multiple hearings as ordered by the Court," PSR ¶ 22, pursuant to U.S.S.G. § 3C1.1.
- 3 offense level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

## II. Sentencing Position

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing guidelines are "effectively advisory." *Id.* at 245. Nonetheless, the advisory nature of the Guidelines "does not mean that they are irrelevant to the imposition of a sentence." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006); *see also United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Indeed, the Guidelines "seek to embody the Section 3553(a)

considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (internal quotation omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

A sentencing court should first calculate the range prescribed by the sentencing guidelines after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.*

The 3553(a) factors discussed below support a sentence within the Guideline Range.

**A. Nature, Circumstances, and Seriousness of the Offenses**

At the onset of the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act to provide emergency financial assistance to millions of Americans suffering from the economic effects and dislocation from the pandemic. The law created several specific relief programs of relevance to this case. *First*, Congress appropriated billions of dollars for small business job retention, provided as forgivable loans to cover payroll costs and other covered expenses through a program referred to as the Paycheck Protection Program ("PPP"). SOF ¶ 7. *Second*, Congress provided funds to pay benefits for unemployed workers who normally would not qualify for traditional unemployment insurance benefits. PSR ¶ 15. *Third*, Congress created the Economic Injury Disaster Loan ("EIDL") program to provide working capital for small business to meet financial obligations.

It was against this backdrop that the defendant exploited the unique national moment to

enrich himself at the expense of truly needy small business owners and unemployed workers. Across 2020 and 2021, the defendant repeatedly made false certifications to obtain four PPP loans on behalf of two defunct companies, neither of which had any legitimate business activity. SOF ¶¶ 1-3, 14. Rather than stating truthfully that his businesses had no employees, Kelley claimed over a hundred employees and hundreds of thousands of dollars of monthly payroll. *Id.* ¶ 14(b). Kelley also fabricated supporting documentation, including Internal Revenue Service tax returns purporting to show legitimate business activity. *Id.* ¶ 14(a). As a result, Kelley received $1,143,224 over four separate PPP loans. Though Kelley certified that the loan proceeds would be used exclusively for covered PPP business expenses, *id.* ¶ 14(c), he actually spent $142,711 at various casinos and on gaming and transferred $834,077 to his personal brokerage accounts, *id.* ¶ 18. Then, Kelley again lied on four separate PPP loan forgiveness applications – certifying that funds had been properly applied to covered PPP expenses – to obtain a complete discharge of his loans. *Id.* ¶ 13.

Along the way, Kelley also lied to obtain $10,000 funds from the EIDL program. SOF ¶ 22. He further lied in statements to the Virginia Employment Commission to obtain pandemic-related unemployment insurance funds to which he was not entitled, stating that he was laid off from his job as a sales manager at Focused Resources, a company that Kelley owned and the same company for which Kelley filed PPP loans. *Id.* ¶ 21.

The repetitive, continuous nature of the fraud makes clear that the criminal conduct was not a product of a momentary lapse of judgment or a solitary aberration from otherwise law-abiding behavior; instead, the defendant made the willful, deliberate choice to loot multiple pandemic relief programs over and over again. By looting these programs, the defendant repeatedly stole funds from those who needed it the most during the pandemic. In all, the nature

and circumstances of the defendant's offenses – defrauding government relief programs in a time of unprecedented economic turmoil and distress – warrants a significant term of imprisonment. A 78-month recommendation is well supported by this sentencing factor.

### B. History and Characteristics of the Defendant

Kelley's background also supports a significant sentence. Unlike many defendants who come before the Court, Kelley enjoyed many opportunities and advantages in life. The defendant's early childhood was relatively stable – free of domestic violence, substance abuse issues, or other neglect. PSR ¶ 48. The defendant is in good physical health but suffers from diabetes. *Id.* ¶¶ 58-60. Though the defendant has previously stated that he suffered from depression and anxiety, he reports that he "no longer has depression and anxiety symptoms and that he does not need the medications any longer." *Id.* ¶ 62. There is no evidence of substance abuse issues.

The PSR indicates an area that might be used to theoretically mitigate Kelley's crime spree: Following an injury to the defendant's father, the family's primary breadwinner, when the defendant was in 9th grade, the family relied on disability assistance and support from the church to get by. *Id.* ¶¶ 49-50. In response to this hardship, the defendant admirably began working to support the family. *Id.* ¶ 51. The defendant eventually earned his GED, moved out of his parents' house, and got married. *Id.* In another world, Kelley may have drawn empathy from his own experiences with economic stress and uncertainty following the incapacitation of his father, the family's primary breadwinner. Instead, Kelley chose to raid programs that were meant to address economic stress for other vulnerable Americans at a time of national disaster. Whatever the root of Kelley's troubles, those wounds do not excuse his grift and deceit.

### C. Adequate Deterrence to Criminal Conduct

The Court must weigh the need for the sentence imposed to afford adequate specific and general deterrence. 18 U.S.C. § 3553(a)(2). In this respect, the Government submits that a 78-month sentence is also justified.

1. The Court must send a strong message to individuals contemplating disaster relief fraud.

General deterrence is perhaps even more important in financial fraud cases such as this one, which are often difficult to detect, investigate, and prosecute. *See e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'"). Moreover, general deterrence is particularly apt in cases involving government program fraud, which is often rampant and pervasive. Due to its prevalence, the government often lacks the ability to catch and prosecute all the fraud affecting a particular government program. A substantial penalty will provide the appropriate disincentives to those contemplating defrauding government relief programs. *See, e.g., United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized."); *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976) (stating that absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved.).

This will not be the last time that the nation faces a moment of crisis – and when that moment arises, there will be fraudsters who seek to take advantage of that crisis for selfish gain.

Court must send the strongest possible message to those who would engage in similar conduct that they will be caught and punished to the fullest extent of the law.

        2. A strong sentence is necessary to specifically deter this defendant from lying for selfish gain.

Even after his Indictment in this present matter, the defendant continued to lie for selfish gain. While on bond in the Court, the Defendant lied repeatedly to avoid coming to Court as ordered.

*First*, the defendant failed to appear in Court on September 6, 2022 and informed the Court, via counsel, that he went to the federal courthouse in Birmingham, Alabama instead. *See* ECF No. 28 at 2. Counsel informed the Court that Kelley "accidentally bought a plane ticket that puts him in to Richmond at 9:58pm tonight as opposed to 9:58 a.m." As a result, the Court reset the next hearing for September 8, 2022 at 3:00 p.m. USMS bought a flight ticket for Kelley to depart Birmingham, Alabama on September 8, 2022 and arrive in Richmond by 11:34 a.m. on September 8, 2022, providing this flight itinerary to Kelley through counsel. PSR ¶ 6. USMS further confirmed with the defendant's attorney that the defendant received the ticket. *Id.* Yet, the defendant again failed to appear in Court on September 8, 2022. *Id.* ¶ 7. To explain his non-appearance, the defendant thereafter falsely claimed that his flight to Richmond was incorrectly scheduled for September 8, 2022 evening. *See id.*; ECF No. 30.

*Second*, after Court again reset the next hearing for September 16, 2022 at 11:00 a.m., the Court instructed defense counsel that the defendant "is to arrive on 9/15/2022 to make sure he is ready at the scheduled time on 9/16/2022 or a warrant will be issued." *See* ECF No. 30. The Court ordered that the defendant "shall arrive in Richmond, Virginia not later than 3:00 p.m. on September 15, 2022." ECF No. 31. Thereafter, on September 12, 2022, USMS bought a flight ticket for Kelley to depart Birmingham, Alabama on September 15, 2022 at 9:41 a.m. and arrive

8

in Richmond by 2:29 pm on September 15, 2022. PSR ¶ 8. USMS provided this flight itinerary to Kelley through counsel. *Id.* Deputy Marshal Stalnaker confirmed that Kelley would have been given a boarding pass at the airport upon check in. *Id.* Yet, on September 15, 2022, Kelley told his probation officer that "his boarding pass didn't work, so he couldn't board the plane for VA." PSR ¶ 12. In a November 10, 2022 letter to the Court, the defendant, claiming to be a victim of identity theft, stated, "The thieves took over my iPhone for at least 30 days, cancelling and altering my flight and hotel arrangements to my court date." PSR ¶ 11. As the defendant well knew, this far-fetched story was not true. In a separate Mirandized interview in the Vestavia Hills Police Department on September 20, 2022, the defendant attributed his non-appearance to a different cause –saying that "he had packed up his medicine and was waiting for someone to come get him and that he knew he was wanted because the people in Virginia didn't understand how hard it is to fly through Atlanta." PSR ¶ 10.

Kelley's lies to avoid having to appear before this Court further substantiate a significant, 78-month sentence.

**D. The Need to Provide Just Punishment and the Need to Protect the Public**

During the height of the COVID-19 pandemic, the defendant repeatedly stole government benefits intended for small businesses and workers. Though the government is the ostensible victim for restitution purposes, the harm in this case cannot be measured solely by the pecuniary losses. Rather, the Court should also consider the collateral harms on other victims caused by the defendant's conduct.

*First,* by causing fraudulent unemployment insurance applications to be submitted, Kelley raised administrative costs for Virginia Employment Commission, occupying scarce bandwidth needed to address and resolve legitimate applications by unemployed workers. These costs were

not merely theoretical. Facing lengthy delays in the adjudication of unpaid claims, genuinely unemployed workers were forced into class action litigation against the VEC in the District Court for the Eastern District of Virginia to obtain unemployment benefits owed to them in a timely manner. As the Court aptly observed in that lawsuit, "the unprecedented COVID-19 pandemic and pandemic-related restrictions caused a significant increase in unemployment claims and overwhelmed unemployment compensation programs nationwide, including in Virginia." *Cox et al. v. Hess*, Case No. 3:21-cv-253-HEH, ECF No. 25 at 1 (Order). Kelley's sentence must reflect the harm to unemployed workers who were left waiting for needed benefits while fraudsters chewed up the VEC's bandwidth.

*Second,* the funds that Kelley stole were limited. In fact, nearly four weeks before the scheduled end of the PPP program, in early May 2021, the PPP program ran out of money.[1] Every dollar that Kelley stole was a dollar taken out of the hands of a truly needy American small business to cover the payroll costs of truly deserving workers.

*Third*, while the government is the ostensible victim in this case, the defendant also defrauded American taxpayers, whose earnings underlie the government programs in question.

In conclusion, the defendant's crimes are serious and deserving of a 78-month term of imprisonment. The defendant is unlikely to ever repay the government, and a lengthy sentence may be the only measure of justice that those victimized by the defendant's scheme will ever receive.

---

[1] Stacy Cowley, *The Paycheck Protection Program is out of money*, N.Y. Times, (May 4, 2021), https://www.nytimes.com/2021/05/04/business/paycheck-protection-program-closes.html.

### III. Conclusion

The defendant exploited the COVID-19 pandemic through multiple overlapping fraud schemes, enriching himself at the expense of truly needy small businesses and workers, who were the intended beneficiaries of COVID-19-related governmental benefits. A 78-month sentence is sufficient but not greater than necessary to account for the defendant's misconduct.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Avi Panth
VA Bar No. 92450
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: avishek.panth@usdoj.gov

11